Lowe, Respondent vs. Ring, Appellant.

*April 10 — April 27, 1900.*

106   647<br>s115   579

*Limitation of actions: Attorneys at law: Termination of employment: Evidence: Corporations: Compensation of officers for special services: Implied contracts: Estates of decedents: Agreement by creditor to pay administrator: Public policy.*

1. The statute of limitations does not commence to run upon an attorney's claim for services until the termination of the proceeding in which they were rendered, where his employment was to conduct such proceeding to its termination, or until the employment is otherwise terminated. Thus, evidence tending to show that an attorney was employed to collect certain notes by suit; that the action was tried several times but no result reached; that a reference as to one branch of the case was agreed on; that the case lay dormant for more than six years in this condition, when a trial was had before the referee, conducted by said attorney; and that thereafter he was advised by the client to take no further steps,— is *held* sufficient to justify a finding by a jury that the employment was entire and did not terminate until after the trial before the referee.

2. So, evidence tending to show that in 1881 or 1882 a bank placed a note in an attorney's hands for collection; that he procured from the maker an assignment of a life insurance policy as collateral; that in order to perfect the collateral he brought an action to compel the issuance of a paid-up policy, which was settled by its issuance; and that he retained the policy and the note as an uncompleted collection until 1897, when he surrendered it to the president of the bank upon the assurance that he would be paid for his services,— is *held* sufficient to sustain a finding that there had been no termination of the employment, at least until the surrender of the policy.

3. Where services are rendered to a corporation by one of its officers, which are clearly outside of his official duties, a recovery may be had therefor under implied contract, if the circumstances be such as to fairly imply that it was expected that the services were to be paid for; and in considering whether such implied contract was proven, or whether the services were rendered gratuitously, the nature of the corporation and its business, the extent and character of the services, the comparative amount and value of the services of other officers, the extent of the officer's interest in the corporation, as well as all the other surrounding circumstances, are to be considered.

4. Where a bank is creditor of the estate of a decedent, and vitally interested in a wise administration thereof, it may contract, either expressly or by implication, to pay one of its officers for his services as administrator of the estate.

APPEAL from a judgment of the circuit court for Clark county: A. J. VINJE, Judge. *Reversed.*

This action was commenced December 31, 1897, and was brought to recover upon six promissory notes executed by the defendant at various times to the Clark County Bank, a banking corporation located at Neillsville, Wisconsin. The defendant is an attorney at law who has been practicing at Neillsville for more than twenty-five years, and by his answer he admitted the execution of the notes sued upon, but pleaded as a defense to all except two of said notes the statute of limitations. As to the two notes last mentioned, he alleged by his answer that the plaintiff became the owner thereof after maturity, and with knowledge that the defendant had a setoff and counterclaim thereto. As such setoff and counterclaim, he further pleaded that the bank while it held said notes was indebted to him for legal services performed at its request, for commission on loans secured by him for its benefit, and for salary as president thereof, to an amount exceeding the notes. To this counterclaim the plaintiff replied by a general denial, and further by allegations to the effect that all services rendered by the defendant to said bank were rendered gratuitously and because the defendant was an officer of the bank; and the plaintiff also pleaded the statute of limitations as a defense to the counterclaim.

Upon the trial the plaintiff abandoned all causes of action save those based upon the two notes to which the defendant had not pleaded the statute of limitations, and upon those two notes it was agreed by the parties that $2,806.99 was the gross amount due, and the trial proceeded upon the issues arising by the defendant's counterclaim and the reply

Lowe vs. Ring.

thereto. Certain facts in the case were undisputed, and among them are the following:

The Clark County Bank was a state banking corporation, and was incorporated in October, 1875, with 220 shares of stock, of the par value of $100 each; the defendant was not a stockholder when the bank was incorporated, but became such two or three years later, and in 1890 owned eighty shares of stock. He was president of the bank from April 8, 1889, to July 1, 1895. He sold his stock about July 1, 1896. From July, 1876, to January, 1891, the defendant practiced law at Neillsville with Mr. C. A. Youmans, under the firm name of Ring & Youmans. In 1878 or 1879 the firm of Ring & Youmans was appointed attorneys for the bank, and thereafter transacted all of the bank's legal business, until the dissolution of the firm, upon which dissolution the business of the firm was transferred to *Mr. Ring*, and thereafter *Mr. Ring* acted for the bank in its legal matters. While so acting he performed services for the bank in two cases,— *Archer v. Clark County Bank* and *Hewitt v. Clark County Bank*,— for which he was not paid; and the amounts claimed by him as due for those services were allowed by the jury as a setoff, so that no further mention need be made of them.

As to three other litigated matters for which the defendant claimed compensation of the bank, some further statement of the evidence will be necessary. One of these litigated cases was that of *Clark County Bank v. Robert Christy*, which was an action brought to recover upon two notes in 1883 or 1884. The action was tried once in Clark county, resulting in a verdict for the defendant, which was reversed by this court; a second time in Clark county, resulting in a verdict for the defendant, which was set aside, and the case transferred, on change of venue, to Columbia county, where the case was again tried, resulting in a verdict for the defendant, which verdict was also set aside.

These trials occurred some time prior to April, 1889, and soon thereafter, upon stipulation, one branch of the case was referred to a referee; but nothing was done under the reference for more than six years, when a hearing was had before the referee, whose report in favor of the plaintiff was confirmed in the latter part of the year 1895. The defendant's evidence tended to show that *Mr. Ring's* services in this case were reasonably worth from $800 to $900, and that his services before the referee were worth from $50 to $75. These latter services, only, the circuit court permitted to go to the jury; holding that the claim for services upon the trials of the case was barred by the statute of limitations.

The second action in which *Mr. Ring* rendered services for the bank, and for which he claimed to be allowed compensation in the counterclaim herein, was that of *Clark County Bank v. J. S. Kirkland et al.* It appears that Mr. Kirkland prior to 1881 had been vice-president of the bank, and then left the bank, indebted to it upon a note of $1,000, which he was unable to pay. The evidence tended to show that this note was placed in *Mr. Ring's* hands for collection, and that while so holding it he obtained from Mr. Kirkland and his wife, as collateral thereto, the assignment of a $10,000 life insurance policy on the life of Mr. Kirkland. As a means of making this assignment effective as collateral, *Mr. Ring* commenced a suit in the circuit court for Clark county against Mr. Kirkland *et al.* (including the insurance company) to compel the company to transfer to the bank a paid-up policy for its surrender value. This action was brought some time between 1880 and 1883, and was not brought to trial, but was settled by the company issuing a paid-up policy to the bank in 1884 or 1885. Thereafter, *Mr. Ring* testifies, he retained the note and the policy in his possession until August, 1897, at which time Mr. Youmans, then president of the bank, asked *Mr. Ring* for the policy,

Lowe vs. Ring.

or the purpose of realizing some money on it for the benefit of the bank; and *Mr. Ring* gave it to him, stating that he did not wish to waive any claim that he might have for services by surrendering it, and Mr. Youmans stated that he would be paid whatever was right. The testimony tended to show that *Ring's* services in this matter were reasonably worth $250.

The third matter in which *Ring* claims to be entitled to recover compensation for legal services was the settlement of the estate of Levi Archer. The evidence tended to show that Levi Archer was president of the Clark County Bank from 1881 up to the time of his death, April 6, 1889, when he died intestate. It was found that he was indebted to the bank in the sum of $29,000, being $7,000 in excess of the paid-up capital of the bank. At the time of his death, Mr. Archer owned ninety-six shares of the stock in the bank; *Mr. Ring*, fifty-six shares; and the remaining shares were owned by Thomas Hewitt. Ten shares of *Ring's* stock, however, stood in the name of Mr. C. A. Youmans. Upon ascertaining the facts of Mr. Archer's indebtedness to the bank, *Mr. Ring* was in favor of closing the bank and paying its debts; but the other parties interested were opposed to this, and thought that Mr. Archer's estate should be managed by some one connected with and interested in the bank, so as to save as much as possible to apply on the indebtedness to the bank. The testimony showed further that *Mr. Ring* was elected president April 18, 1889, to succeed Mr. Archer, and held this office until 1895; that upon request of the other officers of the bank he accepted the position of administrator of the Archer estate in the summer of 1889, and proceeded to reduce the estate to cash. The agreement, as claimed by *Ring*, under which he did this work was not in writing but was, in effect, that all the moneys realized from the estate should be paid into the bank; that the bank should pay in full all other creditors;

that the claim of the bank should next be paid in full; and that whatever was left, if anything, of the estate should be turned over to Mrs. Archer and her son Frank, who were Mr. Archer's heirs; and that the bank should pay all the expenses of administration, including a reasonable compensation of *Mr. Ring* for his services. The testimony further tended to show that Mrs. Archer and Frank agreed to this arrangement; that *Mr. Ring* proceeded to administer the estate, and collected and paid out over $60,000; that the creditors other than the bank were paid in full; that the principal upon the bank's claim was paid in full, but that it lost all interest thereon; that Mr. Ring has been paid nothing for his services as administrator, except $40. The court ruled, as matter of law, that *Mr. Ring* was not entitled to any compensation for his services in settling the Archer estate.

The testimony further showed that prior to Archer's death one Hill had recovered judgment against him, and that after his death the bank directors, upon the consideration of the matter, directed *Mr. Ring* to take an appeal to the supreme court, which he did, and argued the case in this court, and claimed that his services were reasonably worth $225. This claim the court also took from the jury, holding that *Mr. Ring* was entitled to no compensation for these services.

The court submitted to the jury the question whether the defendant was entitled to any salary as president, excluded from the jury the question of consideration for his services in the Christy case, the Kirkland case, the settlement of the Archer estate, and the case of *Hill v. Archer*, but allowed the jury to settle the value of the services upon final reference of the Christy case, and also the value of the services in the two cases before mentioned of *Hewitt v. Clark County Bank* and *Archer v. Clark County Bank*. The jury returned a verdict by which they assessed the plaintiff's damages at $2,806.99, and allowed the defendant $405 for attor-

ney's fees; leaving a balance in favor of the plaintiff of
$2,401.99, for which sum judgment was rendered, and the
defendant appeals.

For the appellant there was a brief by *S. M. Marsh*, at-
torney, and *Olin & Butler*, of counsel, and oral argument
by *J. M. Olin*.

For the respondent there was a brief by *L. M. Sturdevant*
and *Chas. F. Grow*, and oral argument by *Mr. Sturdevant*.

WINSLOW, J.   The trial court held, as a matter of law,
that the defendant could not be allowed anything (1) for
the services in the action against Christy, except the serv-
ices before the referee, because the claim was outlawed;
(2) for services in the action against the Kirklands, for the
same reason; (3) for services as administrator in the settle-
ment of the Archer estate, because no valid contract to pay
for the same was shown; and (4) for services upon the ap-
peal in the case of Hill against the Archer estate, because
the bank never authorized him to defend that case in any
proper manner.   Proper exceptions were taken to these
rulings, and they are assigned as errors upon this appeal.

1. As to the statute of limitations: The rule which is es-
tablished with substantial uniformity by the decisions is
that the statute does not commence to run upon an attor-
ney's claim for services and disbursements until the termina-
tion of the proceeding in which they were rendered, where
his employment was to conduct such proceeding to its ter-
mination, or until the employment is otherwise terminated.
Weeks, Att'ys (2d ed.), § 344, and cases cited; *Mygatt v.
Wilcox*, 45 N. Y. 306; *Johnston v. McCain*, 145 Pa. St. 531;
*Davis v. Smith*, 48 Vt. 52.   Applying this rule to the serv-
ices rendered in the Christy and Kirkland cases, it is quite
apparent that it cannot be said, as matter of law, that the
statute of limitations had barred either claim.

In the Christy case the defendant's evidence tends to show
that the employment was to collect certain notes by suit;

that the action was tried several times, but no result reached; that a reference as to one branch of the case was agreed on; that it lay dormant for more than six years in this condition, until finally a trial was had before the referee, which took place in 1895, and which was conducted on behalf of the bank by the defendant; and that after this trial he was advised by the then president of the bank to take no further steps in the case. This evidence would certainly justify a finding by the jury that the defendant's employment was entire, and did not terminate until after the trial before the referee.

In the Kirkland case the defendant's evidence tended to show that in 1880 or 1881 the bank placed Kirkland's note in the defendant's hands for collection; that he procured from Kirkland and his wife an assignment of a life insurance policy, as collateral to the note; that in order to perfect the collateral he brought an action to compel the issuance of a paid-up policy to the bank, which action was not tried, but was settled by the issuance of the paid-up policy to the bank, which policy was retained by the defendant, together with the note to which it was collateral, as an uncompleted collection, until August, 1897, when he surrendered the policy to the president of the bank upon his assurance that he should be paid for his services. Had *Mr. Ring* simply been employed to bring an action to obtain the issuance of a paid-up policy of insurance, the statute of limitations would undoubtedly have commenced to run upon his claim for services from the time when the action was settled and the policy was obtained; but if his employment was to collect the note, and the obtaining of the insurance policy was simply a step in the course of that employment, then we think the statute would not begin to run until his employment to collect the note was terminated, and, under the defendant's evidence, there seems to have been no such termination of the employment,— at least, until August, 1897.

2. As to whether there was any evidence which would

sustain a verdict that there was an obligation to pay defendant for his services in the settlement of the Archer estate: These services were rendered while the defendant was president of the bank, and the view of the trial court seems to have been that under these circumstances there must be shown an express contract made by the directors with the defendant, in order to entitle him to recover. These services were no part of the defendant's duties as president of the bank, and the rule undoubtedly is that where services are rendered to a corporation by one of its officers, which are clearly outside of his official duties, a recovery may be had therefor under implied contract, if the circumstances be such as to fairly imply that it was expected that the services were to be paid for. *Corinne M., C. & S. Co. v. Toponce,* 152 U. S. 405; *Bartlett v. Mystic River Corp.* 151 Mass. 433. In considering whether such implied contract was proven, or whether the services were rendered gratuitously, the nature of the corporation and its business, the extent and character of the services, the comparative amount and value of the services of other officers, as well as all the other surrounding circumstances, are to be considered. *Bartlett v. Mystic River Corp., supra.* The plaintiff claims that there was no sufficient testimony in the present case to show that an express contract was made by the proper officers of the bank to pay the defendant for his services in the Archer estate matter, and, indeed, the testimony seems quite slender; but, conceding that there was no testimony which would justify a finding of express contract, the question still remained whether the circumstances were such as to raise an implied contract.

The suggestion was made that the bank had no power to make a contract to pay an administrator of an estate for his services, because the administrator could obtain his pay in the county court out of the estate, and that a contract to pay him by a creditor would be contrary to public policy.

We have been unable, however, to appreciate the force of this argument. Were there any antagonism between the interests of the creditor and the legal duties of an administrator, the argument would be strong, but there is not. The interest of the creditor is to have the estate prudently administered, to the end that the greatest possible sum should be realized from it, and this is the duty of the administrator. In the present case the bank was vitally interested in the wise administration of Archer's estate. Its claim was very large, and the claims of all other creditors, combined, were very small. By a prudent administration, it seemed that its claim might probably be secured in full, and, if the president of the bank acted as administrator, all funds would pass through the bank. The advantages of a friendly administration were obvious, nor was such an administration inimical to the interests of the estate. Our statute recognizes the right of the principal creditors to administration after the surviving husband or widow and next of kin have neglected to apply. (Sec. 3807, Stats. 1898.) Doubtless, the fact that the appellant was largely interested in the bank (being at that time the largest individual stockholder), and the fact that he was entitled to obtain his pay from the assets of the estate through the county court, should be considered in determining the question whether a contract directly by the bank to pay him for his services in the administration of the estate, and in the appeal in the case of *Hill v. Archer*, should be implied; but these facts would not prevent the making of an express contract for payment, nor the implication of a contract in the absence of an express contract.

Upon the whole case, we think the court was in error in withdrawing the various claims referred to in this opinion from the consideration of the jury, and hence that a new trial of the case is necessary.

*By the Court.*— Judgment reversed, and action remanded for a new trial.